IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES N. MCCARDELL, | : |
| Plaintiff, | : |
| v. | : Civil Action No. 17-1121-RGA |
| CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC., | : |
| Defendant. | : |

James N. McCardell, James T. Vaughn Correctional Center, Smyrna, Delaware; Pro Se Plaintiff.

Roopa Sabesan, Esquire, White & Williams, Wilmington, Delaware; Counsel for Defendant.

**MEMORANDUM OPINION**

January 24, 2020
Wilmington, Delaware

**ANDREWS, U.S. District Judge:**

Plaintiff James N. McCardell, an inmate at the James T. Vaughn Correctional Center in Smyrna, Delaware, filed this action pursuant to 42 U.S.C. § 1983.[1] (D.I. 1). Plaintiff appears *pro se* and has been granted leave to proceed *in forma pauperis*. (D.I. 6). Plaintiff filed an amended complaint on October 23, 2017, and it is the operative pleading. (D.I. 8). Presently before the Court is Plaintiff's motion for reconsideration of the denial of his request for counsel and Defendant's motion for summary judgment. (D.I. 83; D.I. 85). Briefing on the matters is complete.

I. **BACKGROUND**

On December 15, 2015, Plaintiff was shot and sustained injuries that require him to use a colostomy bag and a suprapubic catheter. In the Amended Complaint, Plaintiff alleges Defendant Connections Community Support Programs, Inc. has a regular practice of withholding necessary medical care and that he must constantly "fight" with Defendant to receive any type of medical treatment.

Plaintiff alleges that when he commenced this action, he had not seen a GI physician or urologist in over a year, and he suffers from constant urinary tract infections which result in the frequent administration of antibiotics. Plaintiff alleges the use of antibiotics harms his kidneys, and he is developing an immunity to the antibiotics. Plaintiff alleges it has been determined that surgery is required to correct his medical problems.

---

[1] When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and the person who caused the deprivation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

1

The Court was provided with more than 2300 pages of Plaintiff's medical records. (D.I. 88-92). The record evidence is that due to his extensive injuries, Plaintiff required a colostomy and insertion of a suprapubic catheter which necessitates the use of a colostomy bag. (D.I. 88, Ex. A, Vol. 1, at 529–30). Following his January 5, 2016 discharge from Christiana Hospital, Plaintiff was taken to the Howard R. Young Correctional Institution and housed in its infirmary through March 2, 2016 for close observation and care. (*Id.* at 528-29). During this time he received ongoing care by physicians and medical staff including the administration of pain medication, daily dressing of his wound, and colostomy bag changes. (*Id.* at 476–529). Once discharged to general population, Plaintiff continued to receive medical attention and treatment for his abdominal wound injuries. (*Id.* at 371-475).

In August 2016, Plaintiff was taken to Christiana Hospital and seen by an interventional radiologist for a suprapubic catheter replacement. (*Id.* at 444). When Plaintiff began experiencing urinary tract infections from the catheter and colostomy bag, prison medical staff treated him and prescribed him antibiotics. (*Id.* at 418). In January 2017, Plaintiff was transferred from Howard Young to the James T. Vaughn Correctional Center where medical staff continued to provide him care for the urinary tract flare-ups Plaintiff continued to experience. (*Id.* at 427).

On June 29, 2017, Plaintiff presented for his chronic care visit and was seen by Dr. Adrian Harewood who discussed the possibility of a consult with a surgical expert about the possible reversal of his colostomy and removal of the suprapubic catheter. (*Id.* at 405–06). Medical records indicate that Dr. Harewood explained that the process

involved coordinating both procedures which included having the consult coordinators at Connections reach out to specialists for further consultation. (*Id.*).

The surgery consult was set up on August 31, 2017, and approved by the prison medical director on September 11, 2017. (D.I. 92 at Ex. D). Following approval, Connections consult coordinators worked to have Plaintiff seen by a specialist for his urological condition. (*Id.* at Ex. C). During September and October of 2017, Connections consult coordinators made efforts to schedule Plaintiff with a urologist, but finding a specialist willing to see Plaintiff proved difficult. (*Id.* at Ex. C and Ex. D). For example, the Delaware urologist who had performed Plaintiff's initial catheterization refused to continue with Plaintiff's care on an outpatient basis. (*Id.* at Ex. D). Given the complexity of Plaintiff's injuries, the former treating urologist believed that an out-of-state specialist would be required. (*Id.*). Emails indicate that no Delaware physician would take the case. (*Id.* at Ex. C). In addition, Temple University Urology was contacted, but it refused to take the case. (D.I. 74 at 5-6). In November 2017, Connections Chief Medical Officer Dr. Christopher Moen became involved in the search to find a specialist for Plaintiff. (D.I. 92 at Ex. D). Dr. Moen contacted the urology department at Johns Hopkins Hospital in Baltimore, Maryland, to assess and provide treatment to Plaintiff, and Johns Hopkins agreed to treat Plaintiff. (*Id.*).

Plaintiff had an appointment scheduled at Johns Hopkins on February 2, 2018, but the appointment was rescheduled to March 3, 2018 for security reasons after Plaintiff became aware of the date, time, and location of his appointment. (*Id.*). The

March 3, 2018 appointment was rescheduled after Plaintiff became ill, and he was unable to be transported to Johns Hopkins for the appointment. (*Id.*).

On April 4, 2018 Plaintiff presented to Johns Hopkins and was seen by urologist Dr. Dorota Hawksworth. (D.I. 92, Ex. D and Ex. E at 2390-91). Dr. Hawksworth recommended Plaintiff receive a retrograde urethrogram (*i.e.*, a diagnostic imaging test to further assess his urethral anatomy and the feasibility of corrective surgery). (*Id.*). Connections had some difficulty receiving the paperwork from Johns Hopkins because the Department of Correction officers who transported Plaintiff did not bring back the documentation from Dr. Hawksworth as protocol required. (D.I. 92 at Ex. D). Connections obtain the records in May 2018; they documented the recommendation that Plaintiff undergo a retrograde urethrogram. (*Id.*).

In the meantime, Plaintiff was seen by a colorectal and general surgeon at Bayhealth Medical Center who confirmed that Plaintiff should follow up with Johns Hopkins for further care regarding a possible colostomy removal. (*Id.*). On September 27, 2018, the retrograde urethrogram was performed at Kent General Hospital. Plaintiff's follow-up visit with Dr. Hawksworth occurred on October 22, 2018, but Dr. Hawksworth did not have access to the test results. (*Id.*). Once Dr. Hawksworth obtained the test results, she saw Plaintiff on January 28, 2019. (*Id.*). However, Dr. Hawksworth was not satisfied with the report, finding it to be "not very informative" on the location and extent of Plaintiff's urethral stricture. (D.I. 92 at Ex. D and Ex. E at 2395-2396). Dr. Hawksworth recommended the procedure be repeated under her guidance at Johns Hopkins. (D.I. 92 at Ex. D). The retrograde urethrogram was

4

repeated on March 11, 2019, and the test results were shared with Plaintiff during his April 24, 2019 visit with Dr. Hawksworth. (D.I. 92 at Ex. D and Ex. E at 2396-2397, 2401). Dr. Hawksworth's notes state that she "will discuss this very challenging case with the reconstructive expert and contact the patient/facility back." (D.I. 92 at Ex. D and Ex. E at 2402). Moen's affidavit, dated May 30, 2019, states that Connections is waiting to hear back from Dr. Hawksworth regarding a plan of treatment for Plaintiff's urinary care going forward.[2] (D.I. 92 at Ex. D).

## II. MOTION FOR RECONSIDERATION

On May 30, 2019, the Court entered a memorandum order that denied Plaintiff's request for counsel finding that the case was not so factually or legally complex that an attorney was warranted, Plaintiff had obtained the necessary discovery, and had ably represented himself. (D.I. 74; D.I. 79). Plaintiff moves for reconsideration of the denial on the grounds that a fellow inmate has helped him prepare all his documents, and

---

[2] On December 9, 2019, Plaintiff filed a motion for injunctive relief to "promptly address his deteriorating medical issues." (D.I. 105). His supporting motion, however, makes no mention of his visits with Dr. Hawksworth in 2018 and 2019. Instead, Plaintiff refers to the Delaware urologist who treated him in 2017 and who refused to continue with his care. (D.I. 106). Defendant's response (D.I. 108) along with Plaintiff's recent medical records (D.I. 109) indicate that in late June 2019, Defendant learned that Dr. Hawksworth was no longer with Johns Hopkins and made unsuccess attempts to contact Dr. Hawksworth about Plaintiff's case. (D.I. 108 at 3; D.I. 109 at 35-36). Later, Defendant learned that Dr. Hawksworth's office had closed. (D.I. 109 at 22). Medical records indicate that in the meantime, Plaintiff was evaluated by Dr. Emilie Adah in October 2019, who advised Plaintiff that a "based on his description of the initial injury and the mechanism of his injury, a reversal may not be possible." (*Id.* at 12-13). Defendant continued to arrange for proper follow-up for Plaintiff and, on January 8, 2020, Defendant was successful and arranged a consult with a surgeon at Christiana Hospital who advised Connections to obtain a CT scan and then schedule Plaintiff at Christiana's surgical clinic. (*Id.* at 2, 3, 7). In light of the medical records provided, the Court will deny Plaintiff's motion for injunctive relief.

Defendant has delayed in paying outside medical specialists, which "directly impact[s] on service[s] plaintiff needs." (D.I. 83). Inmate Robert Saunders provided an affidavit in support of Plaintiff's motion confirming that he has provided assistance to Plaintiff. (D.I. 84).

The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). "A proper Rule 59(e) motion . . . must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or [to] prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010).

The Court has reviewed the filings and its memorandum order that denied Plaintiff's request for counsel. Plaintiff's issues relate to the medical care he received and continues to receive, as well any delay in medical care. While Plaintiff's medical condition is complex and the medical records are voluminous, the Eighth Amendment medical issues raised in the complaint are straightforward and do not require any expert testimony, and the essential factual record is revealed by Plaintiff's medical records. As previously noted, Plaintiff (with assistance from inmate Saunders) has ably represented himself in this case, though not as well as a lawyer might have. Unfortunately for Plaintiff, though, there is no evidence that supports his Eighth Amendment allegations. In light of the foregoing, the Court finds that Plaintiff has failed to demonstrate any of the grounds necessary to warrant a reconsideration of the Court's memorandum order that

denied his request for counsel. (D.I. 79). Therefore, Plaintiff's motion for reconsideration of the memorandum order will be denied.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Standards of Law

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-49 (1986).

### B. Discussion

Defendant moves for summary judgment on the grounds that Plaintiff has failed to offer any evidence of: (1) an Eighth Amendment claim of deliberate indifference by Connections or its staff; and (2) a constitutionally defective policy or practice that caused his alleged injury. If Plaintiff has not offered evidence to go forward on both issues, summary judgment for Defendant is appropriate.

Plaintiff's opposition to Defendant's motion for summary judgment consists solely of argument and is not accompanied by a sworn affidavit or signed under penalty of perjury. Plaintiff did not cite to the record or provide any supporting evidence for

consideration by the Court. Plaintiff cannot simply assert factually unsupported allegations to meet his burden at the summary judgment stage. *See Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976). In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if the official knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 104-05. "Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry—since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2017). "Absent that objective inquiry, extrinsic proof is not necessary for the jury to find deliberate indifference in a delay or denial of medical treatment claim." *Id.* "All that is needed is for the surrounding circumstances to be

8

sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*

When a plaintiff relies upon a theory of respondeat superior to hold a corporation such as Connections liable, he must allege a policy or custom that demonstrates such deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992). To establish that Defendant is directly liable for the alleged constitutional violations, Plaintiff "must provide evidence that there was a relevant [Connections] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." *Natale v. Camden Cty. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). Assuming the acts of Defendant's employee have violated a person's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where "the inadequacy of existing practice [is] so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." *Natale*, 318 F.3d at 584.

"'Policy is made when a decisionmaker possessing final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.' *Id.* "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Miller v. Corr. Med. Sys., Inc.*, 802 F. Supp. at 1132.

There is no dispute that Plaintiff has a serious medical condition. Plaintiff states that the issue is not a dispute over treatment, but rather lack of treatment. (D.I. 99 – "Summary of the Argument"). The undisputed evidence of record is that Plaintiff has received continuous medical treatment and care for his medical condition through hospitalizations both inside and outside the prison, referrals and treatment with outside medical personnel, and regular medical care within the prison. Plaintiff contends, without evidentiary support, that Connections denied him needed medical treatment and failed to comply with orders of outside medical specialists.

As previously noted, there is a distinction between claims that treatment was delayed or denied and claims that treatment occurred but was inadequate. *Pearson*, 850 F.3d at 535. The Eighth Amendment's proscription against cruel and unusual punishment mandates that incarcerated offenders receive adequate medical care. However, "a prisoner does not have the right to choose a specific form of medical treatment." *Lasko v. Watts*, 373 F. App'x. 196, 203 (3d Cir. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). In addition, there is a presumption that treatment is proper, absent evidence that there was a violation in the standard of care. *Pearson*, 850 F.3d at 535. Here, there is no evidence that medical personnel violated any standard of care. No reasonable jury could find that an Eighth Amendment violation to the extent Plaintiff contends that medical personal were deliberately indifferent to his serious medical needs.

With regard to delay of care, contrary to Plaintiff's position, the undisputed record indicates that Connections has taken many steps to obtain specialist care for Plaintiff's

complex medical condition, but has been stymied by several medical providers' refusal to take Plaintiff's case – something not within Connection's control. Connections was ultimately successful and engaged the Urology Department at Johns Hopkins Hospital to provide care for Plaintiff. Johns Hopkins Hospital is a nationally-respected hospital. *See also* https://www.hopkinsmedicine.org/usnews/ (last visited Jan. 17, 2019). Given the evidence of record, no reasonable jury could find that Defendant was deliberately indifferent to Plaintiff's serious medical needs by reason of an intentional delay or denial of medical care.

Finally, Plaintiff's position is that Connections maintained a constant practice and policy of delay in providing needed specialized medical treatment. (*See* D.I. 92 at Ex. F, Answer to Interrogatory No. 6.b.). As discussed above, this is simply not supported by the record in this case. To the contrary, the record evidence is that Plaintiff has consistently been provided medical care and treatment for his medical conditions and that Connections diligently sought outside specialist care for Plaintiff's complex medical case. Given that Plaintiff failed to produce evidence of an Eighth Amendment violation or that a violation was caused by Connections' policy or custom, summary judgment is proper on behalf of Connections. *See Palakovic v. Wetzel,* 854 F.3d 209, 232 (3d Cir. 2017) ("To state a claim against a private corporation providing medical services under contract with a state prison system, a plaintiff must allege a policy or custom that resulted in the alleged constitutional violations at issue."); *see also Fields v. Delaware Dep't of Corr.,* 787 F. App'x 796, 799 (3d Cir. 2019) (summary judgment proper for corporate medical provider where there is no "evidence of an Eighth Amendment

violation, let alone a violation that was caused by [the medical provider's] policy or custom").

Given the evidence of record, no reasonable jury could find in favor of Plaintiff. Therefore, the Court will grant Defendant's motion for summary judgment.

## IV. CONCLUSION

Based upon the above discussion, the Court will: (1) deny Plaintiff's motion for reconsideration; (2) grant Defendant's motion for summary judgment; and (3) deny Plaintiff's motion for injunctive relief.

An appropriate order will be entered.